UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEIDA HUKMAN, *pro se*<br><br>Plaintiff,<br><br>vs.<br><br>SOUTHWEST AIRLINES CO.,<br><br>Defendant. | Case No.: 18-CV-1204-GPC-RBB<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 42]** |

Before the Court is Southwest Airlines Co.'s ("Defendant" or "SWA") Motion for Summary Judgment. ECF No. 42. The motion has been fully briefed. On May 1, 2019, Sheida Hukman ("Plaintiff"), who is appearing pro se, filed her first response in opposition to the motion for summary judgment. ECF No. 58. Plaintiff filed an amended response in opposition to Defendant's motion for summary judgment on May 6, 2019. ECF No. 53. Defendant filed a reply in support of the motion for summary judgment on July 24, 2019, ECF No. 57, and Plaintiff subsequently filed a second amended opposition

to the motion for summary judgment. ECF No. 59. In light of Plaintiff's *pro se* status, the Court allowed Plaintiff to file several amended oppositions and permitted a sur-reply from Defendant, which was lodged with the Court on August 5, 2019. ECF No. 63.[1]

Pursuant to Civil Local Rule 7.1(d)(1), the Court finds the matter suitable for adjudication without oral argument. Upon consideration of the moving papers and for the reasons set forth below, the Court **GRANTS** Defendant Southwest Airlines' motion for summary judgment in its entirety.

## FACTUAL BACKGROUD[2]

### A. Plaintiff's Employment and Job Duties with Defendant

Plaintiff Sheida Hukman identifies as a Middle Eastern female of Kurdish descent from Iraq. ECF No. 1; Complaint. In May of 2016, Hukman applied to work for Defendant Southwest Airlines in the positions as a Customer Service Agent and Customer Service Supervisor. ECF No. 57-2 at 4; Plaintiff's Statement of Undisputed Facts. Subsequently, Plaintiff interviewed with Shawn Hulette for the Customer Service Agent position on May 20, 2016 and with recruiter Patricia Lyson, Chad Larimore, and Mr. Hulette for the Customer Service Supervisor position on May 27, 2016.

Plaintiff was not offered the role of Customer Service Supervisor. Instead, on June 30, 2016, Plaintiff received a contingent offer of employment with Defendant for a Full-Time Customer Service Agent position at the San Diego Airport. *Id.* Plaintiff accepted the offer on June 30, 2016 with a hire date of July 18, 2016. *Id.* On her hire date,

---

[1] The Court is aware that Plaintiff filed a joint motion to strike Defendant's sur-reply on August 19, 2019. ECF No. 67. Plaintiff does not legally sufficient articulate reasons for Defendants' sur-reply to be stricken. Given that Defendants' sur-reply was timely and expressly permitted by this Court in accordance to the Court's order granting Plaintiff's motion to file a second amended opposition, the Court will **DENY** Plaintiff's motion to strike.

[2] The facts as recited in this order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future proceedings. The Court has set forth these facts based on the Defendant's statement of undisputed facts and has made note, when applicable, of Plaintiff's material opposition to these facts.

Plaintiff acknowledged that her employment and position included a 180-day probationary period, which was intended to evaluate whether new employees fit in. *Id.* To graduate into the role of a Full-Time Customer Service Agent, Plaintiff was required to satisfactorily complete the 180-day probationary period, which included training and multiple evaluative steps throughout the process. *Id.*

During the probationary period, Plaintiff's employment was governed by the Collective Bargaining Agreement between Southwest Airlines and the International Association of Machinists and Aerospace Workers ("IAM"), AFL-CIO ("CBA"). As a probationary employee, Plaintiff was expressly excluded from the CBA's grievance procedures in accordance with the bargaining agreement, which provided that "nothing in this Agreement shall extend grievance rights concerning discipline or discharge to an employee during his probationary period." *Id.*

In her role as a probationary Customer Service Agent, Plaintiff's job duties included: providing friendly service to and maintaining positive relationships with all internal and external Customers, working in a cooperative spirit to ensure the success of SWA, providing legendary Customer Service to people desiring to travel, use cargo, or baggage service by attending to their needs, greeting and handling Customers in a polite and friendly manner, dealing with mishandled Customers as a result of oversales, delayed or cancelled flights, lost, delayed, or damaged luggage and resolving such problems quickly and within guidelines established by SWA. *Id*; ECF No. 42-5 at 293-94; Ex. 13. Customer Service Agents were also required to possess the "ability to work well with others as part of a team, meet the public, and work under stressful situations." *Id.* at 146-47. Plaintiff also acknowledged receipt and review of SWA's Basic Principles of Conduct. *Id.* at 266-67; Ex. 23. According to the SWA Basic Principles of Conduct, Plaintiff could be penalized and terminated for violations of the prohibition against "[i]nsubordinate conduct or refusing to follow a work order or any act of insubordination." *Id.* at 266; Ex. 23.

**B. Plaintiff's New Hire Training with Defendant**

3:18-cv-1204-GPC-RBB

Upon her hiring, Plaintiff was provided with training at both the San Diego Airport and in Dallas, TX, where SWA is headquartered. ECF No. 42 at 11; ECF No. 42-5 at 148-52. SWA employee training lasts approximately six weeks and includes classroom instruction at Southwestern Adventist University ("SWAU University"), followed by on the job training with a trainer, training at Defendant's Dallas headquarters, and additional follow-up training at the station. *Id*. at 11-12. During the training process, new hires receive training on topics that include employee policies, hazmat, station emergency programs, and customer service security measures. *Id*. at 12. It was common practice at SWA to first provide employees a week of training at SWAU University and then provide two weeks of "on-the-job" training with a trainer at the airport. *Id. See also* ECF No. 42-5 at 499-500.

During her training at the San Diego Airport, which began on July 24, 2016, Plaintiff was assigned to trainer Michael Klatt. *Id*. By her own accord, Plaintiff contends that Mr. Klatt was a "really good" trainer "for me." *Id*. As part of the training process, Mr. Klatt provided training for new hires with respect to the "mechanisms of the computer, policies of the company, how to execute the customer service, the check-in process, and the customer service skills needed to facilitate [Southwest Airlines'] customers." *Id*. Mr. Klatt trained Plaintiff during her first week of work at the airport. On the second week of on-the-job training, Plaintiff worked at the ticket counter. *Id*. During the third week of Plaintiff's training, she was assigned as a "counter assist," a different portion of the training that is not linked with a trainer. *Id*. Plaintiff alleges that Mr. Klatt was also assigned to train another employee, who Plaintiff contends was Hispanic. ECF No. 57-1, SWA Undisputed Statement of Facts at 11.

## C. Plaintiff's Performance and Interpersonal Challenges at SWA

During her introductory period of contingent employment with Southwest Airlines, Hukman was involved in interpersonal disputes with other employees which were cited as a contributing factor for her termination.

### i. The Uniform Incident

The first incident occurred fifty-seven days into Plaintiff's employment and related to Southwest's uniform ordering process. *Id.* at 12. New hires at SWA are typically given a set of standard uniform pieces which are ordered from Lands End. *Id.* In 2016, the standard set included six bottoms, six tops, two belts, and a jacket. *Id.* ECF No. 42-5. Additional items were to be ordered at the new hires' expense. *Id.* On September 12, 2016, Plaintiff ordered her uniform from SWA employee Taylor Farson, who entered the orders for new hires. When Plaintiff attempted to exchange and order several optional pieces via e-mail, Ms. Farson informed Plaintiff that she would be responsible for paying for the items, since Southwest would only pay for the required uniform pieces. ECF No. 42-5 at 134-36. In response, Plaintiff remarked to Ms. Farson, "If you don't want to order than then it's OK. I am not going to back and forth … I will see you on Thursday to explain." *Id.* Hukman Depo. II, 366:17-367:13; Ex. 12.

Following the email interaction, Ms. Farson reported the issue to Chad Larimore and requested a meeting with Plaintiff and another manager. As a result, on September 15, 2016, Plaintiff, Ms. Farson, and Frank McGinley met and discussed the approved and allotted uniform quota outlined in the Ground Ops Employee Handbook. ECF No. 42-5 at 269; Ex. 32. At this time, Plaintiff raised concerns about her co-worker, Jules Alviz, claiming that Ms. Alviz threatened her by telling Plaintiff to be careful because Plaintiff was on probation. ECF No. 42-1 at 13; ECF No. 42-3 at 10-11. Plaintiff described this comment as "threatening' because Plaintiff believed that Ms. Alviz could terminate her employment. ECF No. 42-3 at 10-11.

During this conversation, Mr. Larimore informed Plaintiff that although Ms. Alviz was a senior agent, she could not terminate Plaintiff's employment. *Id.* Plaintiff proceeded to say that she thought Ms. Alviz was a "bad agent" and described Ms. Alviz as a poor performer. *Id.* Mr. Larimore informed Plaintiff that claims of threatening behavior are taken very seriously at SWA and encouraged Plaintiff to work harmoniously and professionally with Ms. Alviz. *Id*; Larimore Decl., ¶ 10.

On September 16, 2016, another meeting took place between Plaintiff, Mr. Larimore, and IAM representative Lorena Todd to follow-up on the concerns that Plaintiff had voiced the day prior about Ms. Alviz. ECF No. 42-3. at 10-11. Plaintiff proceeded to insist that the meeting with Ms. Farson took place because Ms. Alviz had turned Ms. Farson against Plaintiff. Plaintiff also "made it clear that she didn't care for Jules [Alviz] and that she felt that this whole incident came about only because Jules created it." *Id.* Plaintiff also repeatedly contended that Ms. Alviz was "a problem," a "bad agent," and "not a good person." *Id.* Because Plaintiff incorrectly believed that the conversation about the uniform understanding was a product of Ms. Alviz's doing, Mr. Larimore reiterated that the meeting that occurred with Ms. Farson "was set up only because of the uniform misunderstanding and not because of anything to do with [Ms. Alviz]." *Id.* Plaintiff did not agree and continued to assert that "this all came about because of [Ms. Alviz]." *Id.*

Following the meeting, Mr. Larimore discussed the interaction with SWA's Employee Relations and based on the information provided by Plaintiff, determined no further action was needed. *Id.* ¶ 10. At no time during either meeting did Plaintiff complain of any allegedly discriminatory or harassing conduct on the basis of her national origin.

### ii. Plaintiff's Response to Performance Feedback

SWA requires audits, including Soft Skills Audits, for all customer service employees with the goal of performing one audit per employee per month. ECF No. 42-5., Riddle Depo. at 451-453. These Soft Skills Audits are carried out by Customer Service Supervisors who observe the employee from different vantage points, including standing next to or on the other side of the employee or walking in front of the employee to read body language and to listen to the employee. *Id.* In conducting the audits, Customer Service Supervisors evaluate if employees are smiling, outgoing, and friendly. *Id.* The ultimate purpose of the Soft Skills audit was to provide coaching and feedback to employees on interpersonal areas. *Id.*

On September 25, 2016, Randall Riddle conducted a Soft Skills Audit of Plaintiff's job performance. *Id.* at 451. During the Soft Skills Audit, Mr. Riddle observed that Plaintiff was "not outgoing, not friendly, and did not smile." *Id.* at 451-54. Following the completion of the Soft Skills Audit, Plaintiff was presented with the Counter and Curbside Soft Skills Audit that was completed by Mr. Riddle. *Id.* at 270. Mr. Riddle reviewed the document with Plaintiff after he observed her job performance. The document provided in part that:

> [Plaintiff] did not display a welcoming, friendly demeanor and rarely smiled. Her eye contact with our customers is not consistent. She does not acknowledge each customer as they approach her position nor does she try using their names. At the end of each transaction she does not use any pleasantries or thank them. Check in process is efficient. Would like to see her confirm # of bags and destination. In full uniform and looks professional. Please discontinue wearing your sweater over the shoulders.

*Id.* After reviewing the document, Plaintiff began to speak loudly and argue with Mr. Riddle, accusing of him of being a "liar" and claiming that it was "not a valid documentation." ECF No. 42-3 at 13-14; Hukman Depo. II, 408:11-17; 409:13-410:19; Ex. 33. Employee Wendy Meinung was brought in to intervene because of Plaintiff's agitated response and Hukman ultimately refused to sign the document. *Id.* at 14; Riddle Depo. 16:21-13; Hukman Depo. II, 408:3-10.

### iii. Termination of Plaintiff's Employment with SWA

Because of these incidents – and because Plaintiff was not open to constructive criticism, refused to acknowledge the feedback provided to her through the Soft Skills Audit process, and did not work well in a team environment, Plaintiff's employment with Defendant ended on September 26, 2016 after seventy-one days with SWA. ECF No. 42-3 at 13; Adams Depo. 10:20-11:1; 15:23-16:7; Larimore Decl. ¶ 11; Ex. C. On the morning of her termination, Mr. Larimore detailed the concerns and incidents in an email to other SWA employees:

All –

We have had a series of incidents with New Hire CSA Sheida Hukman that have led us to determine she is not fit for Southwest Airlines. There have been some concerns almost from the start of her employment, which included concerns from her Instructor in DAL for Initial Training.

Here are a list of issues to date:

- She had a series of emails back and forth with SAN SWAU Instructor Taylor regarding uniforms. Sheida was dismissive and disrespectful with Taylor during these emails and subsequent conversations. MCS Frank & Taylor met with Sheida to discuss and clarify the uniform issues. A DLE was issued to document the conversation. She was not receptive to the conversation was questions why she was being addressed.
- During the presentation of her 50-day evaluation, she was (sic) did not agree with the comments of the evaluation. She was defiant with CSSII Bruce who delivered the eval, and refused to sign the evaluation. I met with her following the refusal to sign. I when (sic) over the eval point-by-point and explained where each area she needs improvement had merit. Her main sticking point was that we included the feedback we had received from the DAL SWAU Instructor. She felt that because it didn't happen here, it should have (sic) included. I explained that it was all part of her 50-day evaluation period. She stated that she still disagreed with the eval. I have notes from our conversation saved in a document at work.
- She has falsely accused another CSA of threatening her. She went to IAM Rep Lorena and requested a meeting with me. Sheila, Lorena, MCS Julie and myself met with her. Her claims of threats were not found to be credible. I contacted Christine Stewart from ER to discuss her claims, she agreed that there were baseless and no further investigation was necessary. Notes from that meeting are attached as well.

Based on her behavior and attitude, past and present, we will be releasing her from probation as soon you are able to review the documentation and we have your approval. Thanks.

ECF No. 42-3 at 13-14. That same day, Plaintiff met with employees Irvin Adams, Manager of Customer Service, and Theresa Nolten. ECF No. 42-3; Hukman Depo. II, 416:16-417:11. During the meeting, Plaintiff was presented with, but refused to sign the acknowledgement of receipt of, a Failure to Pass Probation document, which confirmed the reason for the conclusion of her employment:

As you are aware, the Contract provides that a new Employee must serve a probationary period of a predetermined length of time in order that the Employee has the opportunity to demonstrate his or her qualifications and ability to adapt to Company policies and procedures. The probationary period affords the Company an opportunity to evaluate your qualifications and ability to perform tasks assigned, as well as your commitment to the goals of Southwest Airlines.

Based on observations of your job performance, we have concluded that you are not suitable for this job. Your employment is terminated as a result of your failure to pass probation.

ECF No. 42-5 at 271; Ex. 34. Mr. Adams also told Plaintiff "[a]nd it's not working. And we have to let you go." ECF No. 42-5 at 114. During this meeting, Plaintiff began speaking louder and she repeatedly threatened to sue Mr. Adams in federal court for harassment and discrimination because Mr. Adams was a "white American" and the supervisors were "white Americans" as well. ECF No. 42-5 at 473-74. Plaintiff also demanded to speak with Station Manager Tom Starr, but was told that Mr. Starr was unavailable. *Id.* Plaintiff also claimed that SAN Above the Wing supervisor Bruce Christmas was discriminatory towards her and called her a "shish kabob" the other night. *Id.* Enraged, Plaintiff further alleged that Customer Service Agents Al Alviz and Jules Alviz called Plaintiff a "shishkabob" once or twice at the ticket counter.

Plaintiff admits that Mr. Adams made no comments about Plaintiff's national origin, accent, or race during the exit interview. ECF No. 42-5 at 114-16. Plaintiff also acknowledges that Ms. Nolten made no comments about Plaintiff's national origin or accent in the interview. During her employment with SWA, *Id.* Plaintiff further confirms that no one at the meeting said anything to Plaintiff about being Middle Eastern. During her employment with SWA, Plaintiff did not raise any complaints about any unalleged unfair or inappropriate treatment because of her national origin or race. *Id.* After Plaintiff's agitated reaction during the termination meeting, she was escorted out.

### iv.    Plaintiff's Equal Employment Opportunity Commission Charge and Filing of the Present Lawsuit

On November 19, 2016, Plaintiff filed a Charge of Discrimination against SWA with the California Department of Fair Employment and Housing ("DFEH") and the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on national origin and retaliation.  ECF No. 42-5 at 272; Ex. 35.  On March 27, 2017, the EEOC issued Plaintiff a Dismissal and Notice of Rights, contending that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  ECF No. 42-5 at 272; Ex. 36.  The Dismissal and Notice of Rights confirms that for Title VII claims, Plaintiff "may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court" and that Plaintiff's lawsuit "**must be filed <u>within 90 days</u> of [ ] receipt of this notice**; or your right to sue based on this charge will be lost." *Id.* (Emphasis in original).  *Id.*  The Notice of Suit Rights also provides that "this will be the only notice of dismissal and of your right to sue that we will send you" and noted that the "time limit for filing suit based on a claim under state law may be different."  *Id.*  Plaintiff received the notice on April 7, 2017.  *Id.*

Plaintiff commenced this action on November 27, 2017 in state court.  Defendants removed the action to this court on June 8, 2018.  In her Complaint, Plaintiff alleges eight causes of action: (1) Discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) Retaliation in violation of Title VII; (3) Retaliation in violation of the California Fair Employment and Housing Act ("FEHA"); (4) Denial of hiring as a supervisor in violation of Title VII; (5) Denial of proper training as a customer service agent in violation of Title VII; (6) Harassment in violation of Title VII; (7) Failure to stop discrimination and harassment; and (8) Wrongful termination in violation of public policy.  *See generally*, ECF No. 1-2, Plaintiff's Complaint.

## LEGAL STANDARD

### A) Summary Judgment Under Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure ("Rule") 56 empowers courts to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just,

speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted) (emphasis in original). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380.

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Sluimer v. Verity, Inc.*, 606 F.3d 584,

587 (9th Cir. 2010). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325.

When evaluating a motion for summary judgment, the court must "view[ ] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The court may not, however, engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts as those functions are for the trier of fact. *Anderson*, 477 U.S. at 255. Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250-51 (1986).

### B) Special Considerations for Pro Se Litigants

The Ninth Circuit has repeatedly cautioned that pro se litigants must be treated with liberality. *See, e.g., Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996) ("As a general matter, this court has long sought to ensure that pro se litigants do not unwittingly fall victim to procedural requirements that they may, with some assistance from the court, be able to satisfy.") As such, courts have often "held pro se pleadings to a less stringent standard than briefs by counsel and reads pro se pleadings generously, 'however inartfully pleaded.'" *Davis v. Silva*, 511 F.3d 1005, 1009 n.4 (9th Cir. 2008). Thus, pro se litigants are afforded the benefit of the doubt in order to "ensure[ ] meaningful access to the courts." *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).

Nonetheless, pro se litigants must follow the same rules of procedure and substance that govern other litigants. *King v. Atiyeh*, 814 F.2d 55, 567 (9th Cir. 1987); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). And in giving liberal interpretation to a pro se complaint, the court is not permitted to "supply essential elements of the claim that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). Nor is the court required to provide a non-prisoner pro se litigant with notice of the summary judgment rules. *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007). "Ignorance of court rules does not constitute

excusable neglect, even if the litigant appears pro se." *Swimmer v. IRS*, 811 F.2d 1343, 1345 (9th Cir. 1987).  As with pleadings drafted by lawyers, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## **DISCUSSION**

### A) **Plaintiff's Federal Claims Under Title VII**

Plaintiff brings her first, second, fourth, fifth, and sixth causes of action under Title VII on the basis that she was discriminated against because of her national origin during her hiring, employment, and subsequent termination with Defendant.  *See* ECF No. 1-2; Complaint at 11.  SWA challenges these causes of action on statute of limitations grounds and on the merits.  The Court addresses these arguments in turn.

### i) **Statute of Limitations for Plaintiff's Title VII Claims**

Defendant contends that all of Plaintiff's causes of actions premised on Title VII are time-barred due to Plaintiff's failure to timely file her Complaint.  Specifically, Defendant avers that "[f]or Title VII [. . .] claims, a Plaintiff must file within 90 days of receipt of a right-to-sue letter." *Gamble v. Kaiser Foundation Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1022 (N.D. Cal. 2018).  Moreover, Defendant notes that Plaintiff's EEOC notice, which issued on March 29, 2017, and marked as received on April 7, 2017, provided that Plaintiff's Title VII claims "**must be filed within 90 days of [ ] receipt of this notice**; or your right to sue based on this charge will be lost." *Id.* (Emphasis in original).  Based on the Dismissal of Notice of Rights from the EEOC, Defendant proffers that Plaintiff was required to file her lawsuit by June 28, 2017.  Since Plaintiff commenced this action in state court on November 27, 2017, Defendant avers that Plaintiff's late filing is inexcusably fatal to her Title VII claims.

Plaintiff does not dispute that she received a right to sue notice from the EEOC that was issued on March 29, 2017.  Plaintiff also does not contest that her right to sue notice instructed her to file a lawsuit within 90 days of her receipt of the notice if she intended to bring to bring any Title VII claims.  Plaintiff further agrees that she filed her complaint

on November 27, 2017. However, Plaintiff argues that her Title VII claims are timely because she filed her complaint in state court and was therefore not subject to the statute of limitations set forth in the EEOC right to sue notice. As such, Plaintiff submits that her claims cannot be time-barred because she had brought them in state court within one year of the notice.

The Court agrees with Defendant that Plaintiff's Title VII claims are time-barred. The Dismissal and Notice of Rights that Plaintiff received from the EEOC made clear through multiple unambiguous instructions, in all-capital letters and underlined with bold typeface, that Plaintiff was required to file her lawsuit within ninety days of receipt of the notice to comply with the statute of limitations for Title VII claims. ECF No. 42-5 at 274-75; Ex. 36. The notice further clarifies that "in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later." *Id* at 275. (Emphasis in original). Thus, Plaintiff cannot argue that she had inadequate notice of the ninety-day deadline to file her lawsuit. In addition, it appears that Plaintiff has filed at least three additional Title VII lawsuits that entail the same administrative requirements as here. ECF No. 42-1 at 18. *See Hukman v. U.S. Airways/American Airlines, et al.* 2:17cv-00742-JS (E.D. Penn.); *see also Hukman v. Communication Worker of America, et al.* 2:17-cv-00741-JS (E.D. Penn.); *Hukman v. Alaska Airlines* CV18-01104-PHX-DLR (D. Az.). A review of the evidentiary record uncovers no basis for equitable tolling and Plaintiff has not put forth this argument. And finally, Plaintiff is mistaken that her Title VII claims are timely simply because she filed her action in state court. Since Plaintiff elected to bring claims under Title VII, she was required to comply with the statute of limitations applicable to Title VII claims, regardless of the forum in which she chose to initiate her lawsuit.

The law is clear on this matter. In *Iniguez v. Boyd Corp.*, 2009 WL 2058529, *5-6 (E.D. Cal. July 13, 2009), a plaintiff's Title VII claims filed in state court were time barred because Plaintiff filed his complaint more than ninety days after receipt of the

right to sue notice. *See also Ioane v. Hawaii*, 2001 WL 399465 (9th Cir. Apr. 18, 2001). This limitations period has been strictly enforced against *pro se* and represented litigants alike. *See Payan v. Aramark Management Service Ltd. Partnership*, 495 F.3d 1119, 1127 (9th Cir. 2007) (where the Ninth Circuit affirmed a district court's decision to grant summary judgment for defendant against a *pro se* plaintiff on the basis that plaintiff's claims on the basis were untimely because they were filed three days beyond the ninety-day period). Here, Plaintiff similarly chose to bring claims under Title VII, which are strictly bound by the deadline prescribed in her EEOC right to sue letter. The fact that Plaintiff filed her complaint in state court – and that it was later removed to this court – does not alter the federal nature of her claims. Although Plaintiff arguably had until July 6, 2017 to bring a lawsuit based on the letter's date received stamp,[3] she did not file her complaint until November 27, 2017. Accordingly, the Court finds that Plaintiff's delay in bringing her lawsuit – nearly eight months after her right-to-sue notice was issued – constitutes independent grounds to render her Title VII claims incurably time-barred. As such, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to Plaintiff's first, second, fourth, fifth, and sixth causes of action under Title VII.

ii)     **The Merits of Plaintiff's Causes of Action for Discrimination Under Title VII Based on National Origin (Count 1)**

Even if Plaintiff's Title VII claims were not time barred, the Court also finds that Plaintiff's Title VII causes of action fail as a matter of law. To establish a *prima facie* case of discrimination on the basis of national origin, Plaintiff must prove that: (1) [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject

---

[3] When it is unclear as to when a Plaintiff's received her right-to-sue notice, some courts have used three-day, five-day, or seven-day presumption periods after the date of issuance to establish the date of receipt. *See Payan v. Aramark Management Services Ltd. Partnership*, 495 F.3d 1119, 1124-26 (9th Cir.) (2007). In the briefing papers, Defendant appears to suggest that the date of issuance of the EEOC notice – March 29, 2017 – also serves as the date of receipt. However, in this case, the Court will use the "received" stamp marked on the letter of April 7, 2017 – a full nine days after the issuance of the letter and the interpretation most generous to the Plaintiff – to calculate the statute of limitations.

to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably." *Chuang v. Univ. of Cal. Davis, Bd. Of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  If a Plaintiff fails to allege "specific facts" to establish a *prima facie* case for discrimination, a Defendant is entitled to summary judgment. *Palmer v. U.S.*, 794 F.2d 534, 536-39 (9th Cir. 1986).  But if Plaintiff establishes a prima facie case of discrimination, the burden shifts to SWA to articulate "some legitimate non-discriminatory reason for the challenged action." *Chuang*, 225 F.3d at 1123-1124.  If SWA again meets this burden, then Plaintiff must show that the articulated reasons were pretext for another discriminatory motive.

To support her claims, Plaintiff points to several instances of conduct: (1) that she was not hired as a supervisor because of her ethnicity; (2) that she was "purposely" provided with the wrong uniform size as a result of discrimination; (3) that her supervisor, Mr. Randall Riddle, conducted a "false" audit of her work that was based on discrimination and "his own opinion;" (4) that Plaintiff was treated differently from other similar situated probationary employees; (5) that she was harassed and threatened by other employees based on her national origin; (6) and that she was terminated "without an investigation" in retaliation for protected actions." *Id.*

Turning to the substance of Plaintiff's Title VII national origin discrimination claims, the Court finds that Plaintiff has failed to present specific and sufficient evidence of national origin discrimination. The parties do not dispute that Plaintiff is a member of a protected class with respect to her national origin.  However, the parties disagree whether Plaintiff has established the remaining elements of a prima facie case of discrimination.  Plaintiff's claims of discrimination are confounding, unsupported and warrant summary judgment in favor of Defendant.

### 1. Defendant's Decision Not to Hire Plaintiff as a Customer Service Supervisor

Beginning with SWA's decision not to hire Plaintiff as a Customer Service

Supervisor, there is no genuine issue of material fact that Defendant's actions were not motivated by Plaintiff's national origin. In her Complaint, Plaintiff contends that she was denied employment by Defendant as a supervisor because of her national origin. *See* ECF No. 1-2; Complaint at 13. This discrimination claim in Count I overlaps with Plaintiff's Fourth Cause of Action – denial of hiring in violation of Title VII. As such, the Court will address them together.

Without providing any factual support, Plaintiff contends that she was not selected for the supervisor position because "they don't like somebody who has an accent." ECF No. 42-5 at 16; Hukman Depo. I, 179:16-180:6. Plaintiff bases this theory on the belief that her interview "went very well" and she "answered all the questions accurately as a successful customer service supervisor who had a lot of experience." ECF No. 1-2 at 4. Moreover, Plaintiff asserts that she was qualified for the position because she "Belong to a Racial Minority" and that SWA discriminated against her when they – despite allegedly informing her that they typically promoted supervisors internally – "hired individuals from outside the company who doesn't have an Airline experience and was not qualified for the position." *Id.*

As a starting point, SWA maintains that Plaintiff's claims lack any factual support whatsoever. In addition, SWA notes that Plaintiff has admitted that no one at SWA told her they did not like her accent. SWA also points to Hukman's candidate evaluation for the SAN CSSII – or San Diego Customer Service Supervisor – position, which states: "Sheida has a lot of experience – but very low key – unable to really sell herself as a leader at SWA. She never had challenges with her senior employees. Anything she would request of them, they would comply. She appeared very nervous, soft spoken, and timid in her interview. She wasn't as competitive as our other candidates." ECF No. 42-5 at 277, Ex. 39. In that same evaluation form, interviewer Pat Lyson also unequivocally chose not to recommend her for the position. *Id.* Defendant notes that the evaluation review was utterly silent as to Plaintiff's national origin. *Id.* Defendant argues that Plaintiff has failed to offer any support for her claim that she was qualified for the

Customer Service Supervisor position, subjected to an adverse employment action, or presented any "specific facts" that SWA's decision not to hire her as a supervisor was motivated by her national origin. Accordingly, Defendant avers that summary judgment is warranted.

Assuming that Plaintiff was qualified to serve as customer service supervisor, she has failed to offer facts to show that she was treated differently from similarly situated individuals. She offers no facts to support the claim that SWA hired unqualified or less-qualified individuals for the supervisor position. Plaintiff's bald contentions are thoroughly unsupported and are textbook examples of conclusory allegations. Plaintiff's mere belief that her interview "went very well" and her subjective conviction that her background was suitable for the position are insufficient to establish that she was entitled to the supervisory position or discriminated against based upon national origin. *Cf. Arya v. CalPERS*, 943 F. Supp. 2d 1062, 1070 (C.D. Cal. 2013) (plaintiff's "subjective belief that defendant's agents intentionally misrepresented his eligibility for [a retirement program] because they identified his accent and last name as being Iranian and sought to discriminate against him based on his national origin is entirely speculative.") In addition, Plaintiff's admissions that no one at SWA made any comments about Plaintiff's accent, ethnicity, or national origin during the hiring process cut against her attempts to establish any discriminatory basis for Defendant's actions. Thus, summary judgment on the merits is warranted on this claim.

### 2. Plaintiff's Cause of Action for Denial of Proper Training

Next, Plaintiff contends that Defendant denied her proper training as required for her role as a Customer Service Agent because of her Iraqi national origin. ECF No. 1-2; Complaint at 13. Specifically, Plaintiff contends that she was forced to work by herself at the ticket counter during her second week of training and did not receive the same amount of "one-on-one" training time as other new hires. Plaintiff suggests this was "done purposely, you know, by Southwest Airlines, so I could make a mistake or something so they could fire me immediately." ECF 42-5 at 79. This discrimination

claim embedded in Count One is the same as Plaintiff's Fifth Cause of Action – that she was denied proper training as a customer service agent in violation of Title VII – and as such, the Court will address them simultaneously.

Once again, Defendant submits that Plaintiff has "proffered no evidence to establish that she was provided any training that was different or less than training provided to other new hires." ECF No. 42 at 27.

The Court agrees. Plaintiff has not provided any evidence showing that her training was qualitatively less or different than the training provided to others. Nothing in the record shows that Plaintiff received training that was outside the norm of the standard training process at SWA. Plaintiff's own training schedule shows that she was provided classroom training at SWAU University, on-the-job training at San Diego Airport, and training at Defendant's Dallas headquarters for approximately six weeks. And in the parties' statements of undisputed facts, Plaintiff agrees that Mr. Klatt "provided training for new hire employees regarding the 'mechanisms of the computer, policies of the company, how to execute customer service, the check-in process, and the customer service skills needed to facilitate the customers of Defendant.'" ECF No. 57-1 at 22-23; *see also* EF No. 42-5 at 428-429. Plaintiff has also offered no evidence – beyond her unsubstantiated belief that another Hispanic employee[4] was provided more training – which shows that other new hires had more favorable training schedules or received more training time than she did. And finally, there is absolutely no evidence that could support Plaintiff's meritless allegation that SWA purposefully conspired and forced her to work without a trainer – simply so that they could orchestrate her termination when she made mistakes. As such, Plaintiff has failed to proffer evidence creating a genuine issue of material fact that she was denied proper training due to her national origin and summary

---

[4] The Court notes that Plaintiff reached a conclusion about the other employee's ethnicity based on her perception that the woman did not have an accent when she spoke Spanish. As such, the Court is uncertain as to the national origin of the other employee, but recognizes that this fact is immaterial to the legal analysis.

judgment on this claim is warranted on the merits.

### 3. Plaintiff's Discrimination Claims Based on Her Termination

Plaintiff claims that she was discriminated against based on her national origin when her employment with Defendant was terminated. *See* ECF No. 1-2; Complaint at 11. However, Hukman has failed to present evidence creating a genuine issue of material fact that her termination was due to discrimination.

### a. Whether Plaintiff Was Qualified for Her Position

As a probationary Customer Service Agent, Plaintiff was required to maintain a positive relationship with customers, work in a cooperative spirit to ensure the success of SWA, and greet customers in a polite and friendly manner. The undisputed record shows that Plaintiff actively did not demonstrate the ability to "work well with others as part of a team [ . . . ] and work under stressful situations," skills required by the job description for a Customer Service Agent. ECF No. 42-5 at 98; Hukman Depo. II, 377:16-378:14; Ex. 13. Moreover, Plaintiff's concerning interactions with Ms. Farson and Mr. Riddle – which resulted in disciplinary meetings and write-ups – suffice as examples of Plaintiff's inability to work well with others, maintain positive relationships, and work cooperatively with others. *See Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353 (3rd Cir. 1999) ("If a plaintiff cannot prove that she was qualified for a position [ . . . ] it is clear why her discrimination case should fail.")

The above facts support the conclusion that Plaintiff was not qualified to perform the responsibilities of a Customer Service Agent.

### b. Whether Plaintiff was Treated Differently from Similarly Situated Individuals Outside of Her Protected Class

Assuming Plaintiff could establish that she was qualified for her position, her *prima facie* for discrimination would still fail because she has offered no evidence supporting that other similarly situated individuals outside of her protected class were treated differently. In the context of termination, Plaintiff must show that her termination "occurred under circumstances giving rise to an inference of discrimination.'" *Coleman*

*v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990).

Plaintiff has provided no evidence that other probationary employees with different national origins were treated better than she was. The Court can identify only one instance where Plaintiff suggests that she was treated differently from any individuals. Specifically, Plaintiff claims that "Ms. Farson been going around investigating the Plaintiff, to set her up for a permanent termination to help the flight attendant Ms. Williams-Anderson to continue to commit illegal activity, because She is Caucasian and the Plaintiff is Kurdish and not allowed to complain about Caucasian even if she is involved in committing illegal activity." ECF No. 1-2; Complaint at 7. However, this assertion is just one in a string of allegations involving an individual Laura Williams-Anderson who is referred to throughout the Complaint as someone who had "Learned the art of invisibility" and was informing SWA employees that Plaintiff was a "terrorist." *Id.* at 4, 6. Other than these fanciful claims, there is no evidence suggesting that Hukman was treated less favorably than others based on her national origin.

### c. Whether Defendant Terminated Plaintiff's Employment for Legitimate Non-Discriminatory Reasons

If Plaintiff were able to establish a *prima facie* case of discrimination – which, as discussed above, she cannot – the burden shifts to SWA to articulate "some legitimate non-discriminatory reason for the challenged action." *Chuang*, 225 F.3d at 1123-1124. If Defendant meets this burden, then Plaintiff must show that the articulated reasons were pretext for another discriminatory motive. Defendant has presented two categories of reasons for Hukman's termination: (1) her inability to work with others in accordance with her job performance requirements; and (2) her insubordination and unprofessional behavior in response to constructive criticism.

There is no genuine issue of material fact that SWA's actions were not motivated by Hukman's national origin. The record shows that SWA terminated Plaintiff following her failure to pass probation because of her poor job performance, insubordination, and

repeated unprofessional incidents with other employees.  Courts have long recognized that inadequate job performance constitutes a legitimate, non-discriminatory reason for terminating an employee's employment.  *Aragon v. Repub. Silver State Disposal, Inc.*, 292 F.3d 654, 660-61 (9th Cir. 2002) (affirming summary judgment in favor of an employer that chose to terminate a plaintiff's employment for working too slowly in a Title VII discrimination case); *see also Bradly v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (affirming summary judgment in favor of an employer that provided evidence of plaintiff's poor performance).

Defendant relies on a number of documented and undisputed examples which substantiate Plaintiff's poor job performance.  First, Plaintiff was called in for a meeting with supervisors to address her interactions with Ms. Farson about the uniform purchasing policy.  ECF No. 42-3 at 13-14.  During that meeting, Plaintiff was dismissive and blatantly unreceptive to feedback about the interpersonal issues and repeatedly sought to blame others who were uninvolved.  She also began accusing other employees – without support – of threatening her.  Next, Plaintiff was defiant and argumentative in response to her 50-day evaluation.  She openly disagreed with the supervisor and refused to sign the evaluation.  *Id.*  After her Soft Skills Audit, Plaintiff refused to acknowledge any suggested areas of improvement and reacted unprofessionally to any constructive feedback and criticism in the audit.  During the meeting, Plaintiff reacted unprofessionally, raised her voice and accused the supervisor of being a liar, and refused to change her demeanor when another supervisor was brought in to intervene.  Once again, Plaintiff refused to sign the audit report, claiming that it was not a valid documentation.  *Id.*  And finally, Plaintiff admits that she had interpersonal issues and altercations with other staff members, including Taylor Farson and Jules Alviz, which resulted in multiple meetings with management.  Over the course of these proceedings, Plaintiff has never denied any of these incidents.  And although Plaintiff was reprimanded and reminded repeatedly of her duty to work professionally with her co-workers, Plaintiff continued to have insubordinate interactions with her coworkers.

Despite these numerous infractions, Hukman alleges that she was terminated for her national origin alone. She argues that she received accolades for her job performance and "excellent performance evaluations" that "Southwest Airlines refused to Produce." ECF No. 53 at 17-18. In addition, Hukman "denies ever not being Friendly," and "worked well with all passengers and Co-workers." *Id.* To illustrate her argument, Plaintiff avers that "no Complaint was filed" against her and that she was never given negative feedback. *Id.*

The Court finds that the record comprehensively contradicts Plaintiff's unsupported assertions about her job performance. Conversely, there is an abundance of evidence that suggests that Defendant had "concerns [about Plaintiff] almost from the start of her employment." ECF No. 42-3 at 13. Moreover, courts have found that a Plaintiff's "subjective personal judgments of [her] own competence alone do not raise a genuine issue of material fact." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000). As such, Plaintiff's unsubstantiated claims about her performance cannot stack up against the heavy weight of the evidence supporting Plaintiff's repeated instances of poor performance and insubordinate behavior. And finally, Plaintiff herself acknowledges that no one gave her any reasons for her termination other than she was not a "good fit" and could not pass the probationary period. ECF No. 42-5, Hukman Depo. II, 444:14-19. Accordingly, the Court concludes that Defendant has articulated legitimate non-discriminatory performance-based reasons for Plaintiff's discharge.

### d. Pretext for Discrimination Claims

As discussed above, Defendant has met its burden by articulating a legitimate reason for Plaintiff's termination. In such circumstances, the presumption of unlawful discrimination "simply drops out of the picture," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), and under the *McConnell-Douglas* burden-shifting framework, Hukman would now bear the burden of persuading the Court that the stated reason for the discharge was false and the true reason for the discharge was discrimination on the basis of her national origin. To do so, Plaintiff must "do more than establish a prima facie case

and deny the credibility of the [defendant's] witnesses." *Walls v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (citation omitted). While the Court has found that Plaintiff has failed to establish her prima facie case, for the sake of completeness, the Court also concludes that Hukman has failed to offer sufficient evidence of pretext.

To establish pretext, Plaintiff must present "specific and substantial evidence that [Defendant's] reasons are really a pretext for [national origin] discrimination." *Aragon*, 292 F.3d at 661. However, Plaintiff cannot prove pretext by showing that Defendant's acts were "foolish or trivial or even baseless." *Johnson v. Nordstrom, Inc.*, 260 F.3d 27, 733 (9th Cir. 2001). Courts only require that "an employer honestly believed its reason for its action." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (internal quotations omitted). And "[m]ere assertions of discriminatory motive and intent [. . .] are inadequate" to support a claim of disparate treatment on the basis of national origin." *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459 (9th Cir. 1985), *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991); *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir. 1995). In keeping with all discrimination cases, "[p]roof of discriminatory motive is critical." *Int'l Bhd. Of Teamsters v. U.S.*, 431 U.S. 325, 344 n.15 (1977).

Hukman has produced no meaningful evidence indicating either that SWA's explanation was false or that her superiors at SWA harbored discriminatory animus towards her because of her national origin. Hukman's claims that she had been performing her job adequately and that she worked well with her co-workers are not supported by the record. Moreover, an employee's subjective personal judgments of her own competence alone do not raise a genuine issue of material fact. *Schuler v. Chronicle Broadcasting Co., Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986). In addition, Plaintiff does not dispute the occurrence of any of the incidents that Defendant identified. When asked to explain the ways she felt discriminated against or treated inappropriately, Plaintiff offers – in both her Complaint and deposition testimony – vague conclusory conjectures, suspicions, and references to the woman named Laura Williams Anderson: "They

discriminated against me because – because not what Laura Williams what she told them because of my national origin, because they are – you know, they discriminate. That's in their head and in their mind." ECF No. 42-5 at 85. Plaintiff further opines that if Laura Williams Anderson had not said anything about her being "a terrorist," she would still be working at Southwest Airlines. *Id.* at 4-5.[5]

---

[5] The Court is aware that Plaintiff has filed lawsuits against three different airlines for actions that she alleges involve a former coworker named Laura Williams Anderson. Plaintiff contends that she previously worked at U.S. Airways with Ms. Williams Anderson and believes that Ms. Williams Anderson was also employed by Defendant when Plaintiff began her probationary employment. Plaintiff has accused Ms. Williams Anderson of "Attempted Murder right after filling the Lawsuit Against SouthWest Airline in November 2017" and has unsuccessfully demanded information about Ms. Williams Anderson from the FBI. ECF No. 50 at 34. On November 29, 2017, Plaintiff filed a police report about Ms. Williams Anderson, which stated:

"Hukman claimed her former co-worker Laura Williams-Anderson has put tracking device on her car to track her everywhere she goes. On 11/28/17 she left work around 0610 hours and pulled into Wholefood grocery store because she was falling asleep at the wheel and woke up at 1245 hours and noticed Williams-Anderson in her car. She claimed Williams-Anderson put something in her car that made her sleepy. She said she doesn't know exactly what Williams-Anderson did to her. She said said Williams-Anderson carry around fake court order that she has guardianship over her, talks to her employer which created problems and issue at work." ECF No. 59-8 at 46.

Here, Plaintiff's Title VII, retaliation, and harassment claims derive in large part from her belief that Ms. Williams Anderson conspired with employees at SWA to discriminate against her for previously reporting that Ms. Williams Anderson – and other employees at American Airlines – practiced, among other things, the "Art of Invisibility." ECF No. 1-2 at 5. Throughout her deposition testimony, Plaintiff argues that Ms. Williams-Anderson "contacted the agents" to tell them that Plaintiff was a terrorist and also contends that Ms. Laura Williams-Anderson specifically showed up at Plaintiff's gate to call her a "terrorist" at the San Diego Airport. ECF No. 42-5 at 86-87. In her Complaint, Plaintiff makes other numerous references to Ms. Williams Anderson:

(1) "[Taylor Farson] was instructed by the Station Manager Mr. Tom Starr to intentionally discriminate, retaliate, and terminate the Plaintiff employment with Southwest Airline because Mr. Tom Starr was a Friend of a Southwest Airline Flight Attendant " Ms. Laura Williams-Anderson," Caucasion "who committed Illegal Activity by smuggling herself, friends and family members without listing Them in the manifest and introduce the Iranian to Airline Employees so, they could get the airline and airport information from the Airline Employee" worked for the Iranian" , and Learned the art of invisibility." *Id.* at 5.

(2) "The Senior agent Ms. Jules Alvis Knew the policy and [ . . . ] in a threatening manner 'be careful You are in a probation , they are going to terminate your employment , because you took the Flight Attendant Ms. Laura Williams-Anderson to court to get an order of protection.'" *Id.* at 7.

None of Plaintiff's beliefs are supported by the record.  In *Arya v. CalPERS*, an Iranian employee alleged that his surname and accent gave rise to an inference of discriminatory animus.  943 F. Supp. 2d 1062, 1070 (C.D. Cal. 2013).  There, the Court found that the plaintiff's "subjective belief that defendant's agents intentionally misrepresented his eligibility for [a retirement program] because they identified his accent and last name as being Iranian and sought to discriminate against him based on his national origin is entirely speculative." *Id.*  As such, the Court granted the defendant's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *Id.*  Here, there is no evidence that shows Hukman was treated less favorably because of her national origin or that her national origin played any role in SWA's decision-making process with regard to her termination.  Plaintiff's conjectures and suspicions about the reasons for her termination strain credulity and are wholly devoid of evidentiary support.  The Court further notes that Plaintiff has provided no evidence to rebut SWA's showing that Plaintiff was fired for nondiscriminatory reasons.  Thus, the Court finds that Plaintiff cannot establish the reasons for her termination were pretextual.

### iii.   Plaintiff's Second and Third Causes of Action for Retaliation Under Title VII and FEHA

Plaintiff also brings retaliation claims under Title VII and the FEHA.  Both Title

---

(3) "Mr. McGinley stated that Ms. Farson has been going around investigating the Plaintiff , to set her up for a permanent termination to help the flight attendant Ms. Williams-Anderson to continue to commit illegal activity, because She is Caucasian and the Plaintiff is Kurdish and not allowed to complain about Caucasian even if she is involved in committing illegal activity." *Id.*

None of Hukman's assertions about Ms. Williams Anderson have any evidentiary basis in the record.  In fact, there is no evidence that suggests that any of the individuals involved in this matter are at all acquainted with Ms. Williams Anderson.  And moreover, the Court finds that many of Plaintiff's claims regarding invisibility and Ms. Williams Anderson cannot be construed as true, as they are fantastic and "defy reality as we know it." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (finding that "claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel" constitute fantastic allegations).  As such, the Court concludes that Plaintiff has not presented any genuine issue of material fact as to these implausible and wholly unsupported claims.  Accordingly, the Court also **GRANTS** summary judgment with respect to these claims.

VII and the FEHA prohibit retaliation against an employee for opposing any practices forbidden by these statutes. *See* 42 U.S.C. § 2000e-3(a); Cal. Gov't Code § 12940(h).  To establish a *prima facie* case for retaliation under both federal and state law, Hukman must prove that she (1) engaged in a protected activity; (2) suffered an adverse employment action, and (3) can demonstrate the existence of a causal link between the protected activity and the adverse action.  *Passantino v. Johnson & Johnson Consumer Prds., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000); *Lewis v. City of Benicia*, 224 Cal. App. 4th 1519, 1533 (2014).  Here, Plaintiff is unable to establish a *prima facie* case because she has shown neither that she engaged in a protected activity nor that a causal nexus exists between any alleged protected activity and her termination.

### 1. Whether Plaintiff Engaged in Protected Activity

To prevail on a claim of Title VII retaliation, Plaintiff must first demonstrate that she engaged in a "statutorily protected expression." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983).  "Protected activity encompasses participation in enforcing one's rights under Title VII or opposition to an employer's discriminatory conduct under Title VII." *Arya*, 943 F. Supp. 2d at 1071 (citing *Learned v. City of Bellevue,* 860 F.2d 929, 932-933 (9th Cir. 1988)).  Hukman must also prove "but-for" causation, or in other words, that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013).  If Hukman is able to establish this *prima facie* case, the burden would shift back to SWA to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

Defendant argues that neither Plaintiff's complaint – nor her deposition testimony – offer any facts to suggest that she opposed any allegedly unlawful employment practices in violation of Title VII throughout the course of her employment with Defendant.  According to SWA, Plaintiff's admits that she did not complain prior to the termination of her employment and rather that she only complained of harassment and

discrimination after she was advised of her termination. Absent any protected activity, Defendant surmises that Plaintiff's termination cannot be considered retaliatory as a matter of law.

Plaintiff counters that she she "complained of Harassment and Retaliation Based on National Origin to Mr. Larimore on September 15th, 2016 Various Times and also complained various Times and also complained to Mr. irv Adams." ECF No. 53 at 27. In addition, Plaintiff points to her documented complaints about Ms. Jules Alviz on September 15, 2016, when Plaintiff claims that Ms. Alviz threatened her by saying that "You are on probation and you need to be careful of what you say." Plaintiff also notes that after she was informed of her termination, she notified Defendant that she had been discriminated against and allegedly called a "shishkabob" by multiple co-worker. ECF No. 42-5, Hukman Depo. II, 317:23-318:6.

Once again, the Court agrees with Defendant that Plaintiff cannot establish that she engaged in a statutorily protected expression. First, it is well-established that "complaints about personal grievance or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1047 (2005). Similarly, "where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination," an employee's unarticulated belief that an employer has engaged in discrimination cannot serve as grounds to establish protected conduct for a *prima facie* case of retaliation. *Id.* at 1046.

The Court finds that Plaintiff's own testimony conclusively confirms that she never complained about any allegedly discriminatory conduct during the duration of her employment. ECF No. 42-5 at 116-20. Although it is undisputed that Plaintiff complained about Ms. Alviz on September 15, 2016, the record shows that Plaintiff did not allege until after her termination that Ms. Alviz's statements were discriminatory in nature. The record also proves that Plaintiff's assertions about being called a

"shishkabob" did not occur until after her September 15, 2016 meeting with with Mr. Larimore. *See* ECF No. 42-5, Hukman Depo. II, 317:23-318:6. As such, there is no evidence that SWA was ever placed on notice about Plaintiff's concerns or grievances about possible discrimination until after she was advised of her termination. Accordingly, Plaintiff has failed to establish that she engaged in protected activity during the course of employment. Thus, Plaintiff's *prima facie* case for retaliation fails on the first prong.[6]

## 2. Whether Plaintiff Can Establish Pretext of Retaliation

Under Title VII, a plaintiff must prove that Defendant's retaliation was the "but for" cause of the adverse employment action. In other words, the Plaintiff must establish "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532-34 (2013); *Stilwell v. City of Williams*, 831 F.3d 1234 (9th Cir. 2016). If an employer proves that it would have taken the same adverse action regardless of a retaliatory motive, then Plaintiff's case for retaliation would still fail.

The FEHA similarly requires the plaintiff to prove either that the employer's legitimate, non-retaliatory reason is pretextual or that the challenged action resulted from retaliatory animus. *Joaquin v. City of Los Angeles*, 202 Cal. App. 4th 1207, 1226 (2012). Moreover, any circumstantial evidence of pretext must be "specific" and "substantial.". *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

The Court has already found that Defendant's proffered reasons for terminating her employment cannot be construed as pretextual under her Title VII discrimination claims.

---

[6] Although Plaintiff's *prima facie* case for discrimination fails on the first element of the claim – for failure to prove that she engaged in protected activity, the Court has already found that Defendant articulated legitimate and non-retaliatory reasons for terminating Plaintiff's employment. These legitimate and non-retaliatory reasons have already been identified and discussed at length in the Court's analysis of Plaintiff's Title VII discrimination claims, which begin on page 21 of this order.

That same analysis is equally applicable here. Even if the Court were to assume in the alternative that Plaintiff had engaged in protected activity, Hukman has not offered any evidence – direct or circumstantial – that Defendant's motivations in terminating her employment for poor job performance gave rise to an inference of discrimination. As discussed above, Plaintiff's subjective disagreements with Defendant's assessment of her performance are insufficient to defeat summary judgment on this issue absent additional evidence of pretext. Since there is no evidence to support a causal connection between her alleged complaints and the termination of her employment, Plaintiff's state and federal retaliation claims cannot survive summary judgment as a matter of law.

### iii. Plaintiff's Sixth Cause of Action for Harassment

Plaintiff also raises harassment claims under Title VII and FEHA. To prevail, Plaintiff must show not only that she was subjected to unwelcome verbal or physical conduct of a protected characteristic, but also that the the conduct was severe or pervasive enough to actually alter the conditions of Plaintiff's employment such that they created an abusive work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 7786 (1998) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Vasquez v. County of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003) (affirming the dismissal of hostile work environment claims on summary judgment). Although commonly alleged in connection with sex and gender, a hostile work environment claim may also be based on other protected characteristics such as race. *Vasquez*, 349 F.3d at 942 (considering racially based harassment that created hostile work environment). Title VII hostile work standards are equally applicable to claims under the FEHA. *Leland v. City and Cnty. of San Francisco*, 574 F. Supp. 2d 1079 (N.D. Cal 2008).

As a preliminary matter, the Court notes that Plaintiff's harassment claims derive in part from her belief that the aforementioned Ms. Williams-Anderson engaged in a conspiratorial effort with SWA to encourage other employees to harass Plaintiff for reporting that Ms. Williams-Anderson practiced the "Art of Invisibility" and illegal activity. The Court has already addressed why Plaintiff's allegations should be denied on

their fantastical and unrealistic basis alone.  However, in analyzing the remainder of Plaintiff's harassment claims, the Court will attempt to extricate her harassment claims from those involving invisibility and the wholly unsubstantiated illegal activity of others.

Plaintiff points to several specific instances of alleged harassment throughout her employment with SWA.  First, Plaintiff alleges that Customer Service agents Al Alviz and Jules Alviz called Plaintiff a "shishkabob" two times and one time respectively.  ECF No. 42-5 at 90.  In addition, Plaintiff claims that on one occasion after the uniform incident, Ms. Alviz pointed her finger at Plaintiff while stating, "You are on probation and you need to be careful of what you say."  ECF No. 42-5 at 272.  Next, Plaintiff asserts that the day before the termination of her employment, Customer Service Supervisor Randall Riddle mocked Plaintiff's accent by "talking like" Plaintiff to passengers while observing her for a Soft Skills Audit.  ECF No. 42-5 at 23.  And finally, Plaintiff claims – for the first time in her opposition to Defendant's motion for summary judgment – that another supervisor, Mr. Christman, referred to her as a "shishkabob" when she refused to sign her audit review.  ECF No. 53 at 10, 24.

Plaintiff has provided shifting and vacillating accounts of when these statements were made, by whom they were made, and exactly what was said.[7]  Plaintiff has presented no corroborating evidence for any of these allegations.  But even taking Plaintiff's disputed allegations as true, Plaintiff's allegations do not rise to the level of severe or pervasive harassment that would alter the conditions of her employment.

---

[7] It is also established that "the general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit [or statement] contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012); *Van Asdale v. International Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).  During Plaintiff's deposition testimony, she stated that she had already described all incidents of discrimination and did not identify that Mr. Christman used the term "shishkabob" in her deposition testimony.  ECF No. 42-5 at 85-86.  Plaintiff's statement that Mr. Christman also used the term "shishkabob" in her opposition improperly contradicts the relevant deposition testimony.  And moreover, the Court finds that conclusory and speculative testimony is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

To determine whether conduct was sufficiently severe or pervasive enough to warrant liability, courts look to all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). In addition, the working environment must be both objectively hostile, as perceived by a reasonable person, and subjectively hostile, as perceived by the plaintiff herself. *Id.* at 872-73 (citing *Faragher*, 524 U.S. at 787 (1998). The law is well-settled that offhand comments and isolated incidents, unless extremely serious, do not typically rise to the level of discriminatory animus that would change the "terms and conditions" of a victim's employment. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 271 (2002); *Faragher*, 524 U.S. at 778; *Vasquez v. County of Los Angeles*, 37 F.3d 884, 893 (9th Cir. 2002). Rather, a plaintiff pursuing a harassment claim must show a pattern of repeated, routine, or generalized harassment. *Faragher*, 524 U.S. at 787.

Plaintiff's allegations of harassment do not rise to the standard for legally actionable harassment under either Title VII or FEHA. Some of Plaintiff's claims – such as the accusation about Ms. Alviz's cautionary words and Mr. Randall's observations during her audit – do not necessarily indicate animus based on Hukman's national origin. Even when viewing the evidence in the light most favorable to Hukman, all identified instances of national origin harassment taken together show that Hukman was subjected only to two or three offhand comments and isolated incidents of offensive conduct. Based on the legal standards under Title VII and FEHA, no reasonable jury could find that Plaintiff's workplace was so "permeated with discriminatory intimidation, ridicule, and insult [so] severe or pervasive [as] to alter the conditions of her employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19-21 (1993); *see Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952 (E.D. Cal. 2016) (finding that plaintiff's allegations that a Mexican supervisor called him a "stupid Mexican" almost

every day and asserting that he was "above all Mexicans" was not sufficiently severe or pervasive enough to interfere with a "a reasonable employee's work performance" and seriously affect the "psychological well-being of an reasonable employee); *see also Manatt v. Bank of America*, 339 F.3d 792 (9th Cir. 2003) (finding that co-workers' derogatory comments about Chinese people and communism, references to plaintiff as "China woman," imitations and mockery of the appearance of Asians by pulling their eyes back with their fingers, and laughter at Plaintiff's mispronunciations on account of her Chinese ethnicity did not constitute conduct severe, repeated, or pervasive enough to alter the conditions of Plaintiff's employment); *Vasquez v. County of Los Angeles,* 307 F.3d 884, 893 (9th Cir. 2002) (finding no hostile environment discrimination where the employee was told he had a "typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field," and was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"). *Compare Kang*, 295 F.3d at 817 (finding that a Korean plaintiff suffered national origin harassment where the employer verbally and *physically* abused the plaintiff because of his race); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day).

As a matter of law, the isolated claims in this instant case that Plaintiff attributes to her national origin animus do not come close to the type of pervasive and severe conduct required under Title VII and FEHA that would change the terms and conditions of her employment. Accordingly, the Court GRANTS summary judgment as to Plaintiff's claims of harassment.

**B. Plaintiff's Seventh Cause of Action for Failure to Stop Discrimination and Harassment**

Employers must take "all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k); *see also* 42 U.S.C. § 2000e-2(a)(1) (under Title VII). However, an employer is not liable to an employee for failing to take reasonable steps to prevent discrimination unless the employee establishes that he or she actually suffered discrimination. *See Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1154-55 (9th Cir. 2004) ("a finding of discrimination is required before a failure to investigate a discrimination complaint would become actionable [. . . ] if there is no discrimination, then the failure to investigate has no effect on the existence of a discrimination-free workplace.") (citing *Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 288-89 (1998); *Cozzi v. Cnty. of Marin*, 787 F. Supp. 2d 1047, 1073 (N.D. Cal. 2011) (granting summary judgment on plaintiff's failure to prevent harassment and discrimination claim where plaintiff "has established no viable claim of discrimination or harassment.")

As discussed above, Plaintiff has not established viable discrimination or harassment claims. SWA cannot be liable for preventing discrimination or harassment in the absence of actual discrimination or harassment. Accordingly, the Court GRANTS summary judgment in favor of the Defendant on Plaintiff's causes of action for failure to prevent discrimination or harassment.

## C. Plaintiff's Eighth Cause of Action for Wrongful Termination in Violation of Public Policy

Plaintiff also raises a claim for wrongful termination in violation of public policy. Specifically, Plaintiff contends that Defendant violated Title VII and the FEHA by discriminating, harassing, and retaliating against her. Defendant counters by asserting that since Plaintiff's underlying claims for discrimination and harassment fail, her public policy claims must necessarily fail.

Since the Court has already found that Plaintiff was not subject to unlawful discrimination, harassment, or retaliation, Plaintiff's claim for wrongful termination in violation of public policy fails as a matter of law because no violation of public policy

occurred. *See De Horney v. Bank of Am. Nat'l Trust & Sav. Assoc.*, 879 F.2d 459, 465 (9th Cir. 1989) (finding that when plaintiff's underlying FEHA claim fails, the claim for wrongful termination also fails). Accordingly, the Court finds that Defendant is entitled to summary judgment on Plaintiff's public policy claim.

### D. Plaintiff's Claim for Punitive Damages

Lastly, Plaintiff contends that she is entitled to punitive damages. To state a claim for punitive damages, Plaintiff must show, by clear and convincing evidence, that an officer, director, or managing agent of SWA acted with oppression, fraud, or malice, or ratified such conduct. Cal. Civ. Code § 3294; *Basich v. Allstate Ins. Co.*, 87 Cal. App. 4th 1112, 1118-19 (2001). Plaintiff's claims for punitive damages are founded largely through two assertions: (1) that Mr. Larimore, a station manager, committed "fraud" by submitting a "false declaration to the Court, and (2) that Ms. Laura Williams-Anderson "committed malice." ECF No. 53 at 36.

Plaintiff's punitive damages claims cannot survive summary judgment. First, Plaintiff has offered no evidence that either Mr. Larimore or Ms. Williams Anderson are officers, managing agents, or directors of SWA. Rather, the uncontroverted record demonstrates that Mr. Larimore works at the local level at the San Diego Airport and has never been an officer or director of SWA. ECF No. 42-3, Larimore Decl., ¶ 12. Mr. Larimore does not set corporate policy, salaries, or salary raises and is not involved in any managerial decisions at SWA. *Id.* Similarly, Plaintiff has provided even less evidence about Ms. Williams-Anderson. Beyond an unsubstantiated police report and fantastical personal allegations, Plaintiff not provided any proof that Ms. Williams-Anderson has any involvement whatsoever with Plaintiff's employment. And finally, the standard for awarding punitive damages requires that "the evidence be so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind." *Mock v. Mich. Millers Mut. Ins. Co.*, 4 Cal. App. 4th 306, 332-33 (1992). In *Real v. The Continental Group, Inc.*, the federal district court, applying California law, held that an employee was not entitled to punitive damages because he

had failed to show that his employer – despite having willfully discriminated against her and terminating her employment – was unable to establish the requisite malice, oppression, or fraud required under California law. 627 F. Supp. 434, 448-49 (N.D. Cal. 1986). The Court finds that Plaintiff cannot come close to meeting this stringent standard. Accordingly, Plaintiff's claims for punitive damages cannot withstand summary adjudication.

## CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff has failed to proffer any genuine or triable issues as to any material fact for each of her claims. Accordingly, the Court **GRANTS** Defendant's motion for summary judgment in its entirety. The Court also **DENIES** Plaintiff's Motion to Strike the Sur-Reply, ECF No. 67, and **DENIES AS MOOT** the Joint Motion to Continue Hearing, ECF No. 66. The Clerk of Court is hereby directed to close this case.

Dated: August 22, 2019

Hon. Gonzalo P. Curiel
United States District Judge